In re James Francis MELVIN, Petitioner,

Petition for a Writ of Mandamus, or, alternatively, for a Writ of Habeas Corpus.

Misc. No. 76–8077.

United States Court of Appeals, First Circuit.

Submitted Sept. 7, 1976.

Decided Nov. 22, 1976.

As Amended Dec. 29, 1976.

Stay Denied March 7, 1977. See 97 S.Ct. 1323.

Martin G. Weinberg and Oteri & Weinberg, Boston, Mass., on petition and memorandum in support thereof.

James N. Gabriel, U. S. Atty., and Robert B. Collings, Asst. U. S. Atty., Deputy Chief, Crim. Div., Boston, Mass., on memorandum in response thereto.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On August 19, 1975, four armed men robbed the West Yarmouth Branch of the First National Bank of Yarmouth. Although one of the four has been apprehended, tried, and sentenced, the others remain at large, their identity being the subject of investigation by law enforcement personnel and by a grand jury. Petitioner James Francis Melvin was subpoenaed by the grand jury as part of its investigation of the robbery. He appeared on March 25, 1976, and was told that it sought his fingerprints and photographs. Melvin declined to submit voluntarily to fingerprinting and photographing, and the United States Attorney obtained from the district court an order compelling Melvin to submit to fingerprinting and photographing by the FBI. Melvin thereafter complied with the order, and the photographs were shown to witnesses to the robbery.

On July 21, 1976, the United States Attorney moved in the district court for an "Order Requiring James Francis Melvin to Participate in a Line-up". In support of its motion, the Government stated "that James Francis Melvin is a suspect in the armed robbery of the First National Bank of Yarmouth, West Yarmouth Branch . . . and it is necessary for the Grand Jury's investigation that he be viewed in a line-up by various witnesses." The grand jury itself had issued no request to Melvin to appear at a lineup, and the Government explains that it "did not cause a new subpoena to issue for Melvin to appear before the Grand Jury and state on the record his unwillingness to appear in a line-up more out of convenience to Melvin and his counsel than anything else, since Melvin had already been before the Grand Jury, knew the specific crime being investigated, and was represented by an attorney . . . ." Although counsel for Melvin had indicated that he planned to file an opposition to the Government's motion on July 27, 1976, the district court granted the Government's motion on July 26, 1976, ex parte and without a showing of probable cause. On July 28, 1976, the court ordered Melvin to comply with the Government's request for his appearance in a lineup and denied petitioner's motion for reconsideration and rehearing. The lineup was scheduled for the week of August 16 or August 23.

On August 10, 1976, Melvin filed in this court a "Petition for a Writ of Mandamus, or, Alternatively, for a Writ of Habeas Corpus" requesting that we vacate the district court's order. On August 12, 1976, we ordered briefs to be filed addressed to several questions, and stated in our order that we assumed, unless otherwise advised, that the Government would take no action to compel participation in a lineup until after we acted on the petition for mandamus.

▇ This court's jurisdiction to entertain issuance of a writ of mandamus derives from its authority under the All Writs Act, 28 U.S.C. § 1651, to issue the writ when necessary "to confine an inferior court to a lawful exercise of its prescribed jurisdiction . . . ." *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). Since the essence of petitioner's argument is that the district court lacked authority to order a suspect to appear in a lineup on the bare request of the United States Attorney, the petition properly invokes our jurisdiction.

The Government's principal contention is that the district court's jurisdiction to issue the order rests upon its power to order compliance with a grand jury directive. But before turning to this contention, we briefly consider whether apart from acting in aid of a grand jury, the court might have had power on its own to order an unarrested suspect to appear in a lineup. Authority to do so is not conferred by any rule of court or statute, and the All Writs Act, 28 U.S.C. § 1651, seems of doubtful assistance. *But see Wise v. Murphy,* 275 A.2d 205 (D.C. 1971). It has been held that the latter does not provide an independent basis for jurisdiction but merely authorizes a court to issue necessary or appropriate writs in aid of its existing jurisdiction. *Covington and Cincinnati Bridge Co. v. Hager,* 203 U.S. 109, 27 S.Ct. 24, 51 L.Ed. 111 (1906).

▇ The issue thus boils down to a district court's "inherent authority" to compel someone in these circumstances to give identification evidence, and that question is intermingled with the question of the constitutionality of such an order, which must, of course, comply with the fourth amendment. Commonly the fourth amendment is construed to require a showing of probable cause as a precondition to the issuance of judicial process authorizing involuntary searches and seizures. *See, e. g., Berger v. New York,* 388 U.S. 41, 54–55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Application of the United States,* 538 F.2d 956, 959–60 (2d Cir. 1976); *United States v. Illinois Bell Tel. Co.,* 531 F.2d 809, 812–13 (7th Cir. 1976). *Compare United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The fact that the order here was issued without a determination of probable cause might,

therefore, be argued to place it outside any valid exercise of a court's possible inherent power. But in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1967), the Supreme Court intimated that fingerprinting might, under narrowly circumscribed procedures, be ordered upon a showing of something less than probable cause. Building on *Davis,* the drafters of the Model Code of Pre-Arraignment Procedure have proposed that a judicial official be authorized by law to issue, on a reasonable-grounds-to-suspect standard, an order requiring a suspect to cooperate in furnishing physical identification evidence. Model Code of Pre-Arraignment Procedure § 170.2(6) (Prop. Official Draft, 1975). Clearly, however, as the Court's language in *Davis* and the complex draftsmanship of section 170.2(6) reflect, such orders would have to be carefully tailored to be constitutional—a factor which may, as a practical matter, point up the desirability of a rule or statute rather than reliance upon the concept of a court's "inherent" power. We note that a proposal to amend the Federal Rules of Criminal Procedure to provide authority along the lines suggested by the Model Code, which was included in the initial draft proposed by the Advisory Committee on Criminal Rules, 52 F.R.D. 409, 462–472 (1971), did not find its way into the 1975 revisions, *see* 416 U.S. 1001 (1974). And the drafters of the Model Code have observed that "without the authority granted by this Article there is no way that the police can secure the presence of a person who does not consent to participate in identification." Model Code of Pre-Arraignment Procedure Part 1C–Commentary at 461 (Prop. Official Draft, 1975). We are not, however, called upon to decide whether or not an order like that envisaged in section 170.2(6) of the Model Code would, if issued in appropriate circumstances, be sustainable on the basis of a court's inherent power. The Government did not originally seek to justify the order as passing muster under such criteria as are found in that section, nor has it argued its validity before us on that basis. For present purposes, therefore, we may assume that the order is not grounded on any independent authority of the district court, and we turn to the second possible basis for the court's jurisdiction, its power to order a witness to comply with a grand jury's directive.

The Supreme Court recently has confirmed the broad investigative powers of a grand jury. In holding that newsmen enjoy no privilege not to give their testimony to a grand jury, the Court in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), spoke generally of the unique role of the grand jury:

> "Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.' *Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919)."

*Id.* at 688, 92 S.Ct. at 2660. In the following term, the Court again had occasion to consider the investigative power of a grand jury. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), holding a grand jury has power to subpoena a number of witnesses to furnish voice exemplars, and its companion case *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 776, 35 L.Ed.2d 67 (1973), holding a grand jury has similar power to compel the production of handwriting exemplars, stand generally for the twin principles "that a grand jury subpoena is not a 'seizure' within the meaning of the Fourth Amendment and, further, that the Amendment is not violated by a grand jury directive compelling production of 'physical characteristics' that are 'constantly exposed to the public'". *Id.* at 21, 93 S.Ct. at 775, *quoting United States v. Dionisio, supra,* 410 U.S. at 14, 93 S.Ct. 764. In reaching this dual conclusion, the Court quickly dispensed with any notion that a subpoena to appear before a grand jury is a "seizure",

**4**

relying on the "historically grounded obligation of every person to appear and give his evidence before the grand jury." *United States v. Dionisio, supra,* 410 U.S. at 9–10, 93 S.Ct. at 769. *See Fraser v. United States,* 452 F.2d 616, 620 (7th Cir. 1971). And while the Court analyzed more deeply whether the directive to give a voice recording was an unreasonable "seizure", it ultimately concluded that a person has no "reasonable expectation that others will not know the sound of his voice, any more that he can reasonably expect that his face will be a mystery to the world." *United States v. Dionisio, supra,* 410 U.S. at 14, 93 S.Ct. at 771.

In maintaining that the district court's order is not significantly different from the court orders approved in *Dionisio* and *Mara,* the Government emphasizes language in its district court motion that Melvin's appearance in a lineup was "necessary for the Grand Jury's investigation". The Government's district court petitions for enforcement of the grand juries' requests in *Dionisio* and *Mara* similarly stated that the voice and handwriting exemplars at issue were "essential and necessary" to the grand jury investigation. However, there is one important distinction between the court orders approved in *Dionisio* and *Mara* and the district court's order here. The orders in the former were issued only after the witnesses had appeared before a grand jury pursuant to subpoena and were directed by the grand jury itself to produce the exemplars: the court orders obtained were strictly in aid of the grand jury's own directives. In the present case, by contrast, there is lacking any showing that the grand jury itself had appropriately directed Melvin to appear in a lineup and that the district court's order was thereafter issued in necessary aid of the grand jury's power to request a witness "to appear and give his evidence". *United States v. Dionisio, supra,* 410 U.S. at 9–10, 93 S.Ct. at 769.

Indeed, the informality of the challenged procedure is in marked contrast to that earlier followed in seeking Melvin's fingerprints and photographs. With respect to the latter, Melvin was subpoenaed in March of 1976 to appear before the grand jury. He appeared with counsel. The grand jury informed him of the nature of the investigation and then requested his fingerprints and photographs. He refused to submit to fingerprinting and photographing voluntarily. The United States Attorney then obtained in the district court an order directing Melvin to comply with the grand jury's request and Melvin complied.

■ The present procedure took place three months later, when the United States Attorney determined it was necessary for the investigation to have Melvin appear in a lineup. This time, assertedly as a "convenience to Melvin and his counsel", the United States Attorney short-circuited the usual procedure; rather than subpoenaing Melvin, having the grand jury request his appearance in a lineup, and only on his refusal to comply seeking a court order, the United States Attorney, without showing a prior grand jury directive addressed to Melvin, went directly to court seeking the order compelling Melvin to appear in a lineup. This was no mere technical error, as the Government asserts, but an error affecting the proper roles of the prosecutor and the grand jury, since to endorse such a procedure would be to allow the United States Attorney to assume the powers of a grand jury so long as he merely adds the talismanic verbiage that what he seeks is "necessary" in furtherance of its investigations.

■ The Government's contention that there was no need to subpoena Melvin and have the grand jury request his appearance in a lineup because he "had already been subpoenaed, had appeared, had counsel, and the lineup was part of the same continuing grand jury investigation" is not a convincing response. Because of its special investigative function and "the historically grounded obligation of every person to appear and give his evidence before the grand jury", *United States v. Dionisio, supra,* 410 U.S. at 9–10, 93 S.Ct. at 769, a grand jury alone enjoys the inherent right to compel production of identification evidence in these circumstances. Grand jury subpoenas

to testify are deemed "not that kind of governmental intrusion on privacy against which the Fourth Amendment affords protection . . . ." *Fraser v. United States, supra,* 452 F.2d at 620. The grand jury, at least in theory, exercises these broad investigative powers "under the authority and supervision of the court", *United States v. Stevens,* 510 F.2d 1101, 1106 (5th Cir. 1975), as a representative of the public. To be sure, the powers of the United States Attorney in connection with a grand jury investigation are substantial. He may, in practice, select the witnesses to be subpoenaed to appear before the grand jury and generally direct the investigation, *see* 8 Moore's Federal Practice ¶ 6.02[1]. The United States Attorney may obtain subpoenas issued in blank by the court, fill in the blanks, and have the witnesses served without consulting the grand jury, *see* Fed. R.Crim.P. 17(a); 8 Moore's Federal Practice ¶ 17.06. Still, he may not use his subpoena powers under Rule 17 to gather evidence without the participation of the grand jury.

" 'The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure.' They do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office."

*Durbin v. United States,* 94 U.S.App.D.C. 415, 221 F.2d 520, 522 (1954), *quoting United States v. O'Connor,* 118 F.Supp. 248, 250–51 (D.Mass.1953). *See United States v. Miller,* 5 Cir., 500 F.2d 751, 757–58, *rehearing denied,* 5 Cir., 508 F.2d 588 (8–7 decision), *rev'd on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); 8 Moore's Federal Practice ¶ 17.06. *See also*

*United States v. Thomas,* 320 F.Supp. 527 (D.D.C.1970).

An order to appear in a lineup, addressed to someone as to whom probable cause to arrest has not yet been found, and requiring attendance outside the grand jury room at a proceeding not under the grand jury's immediate supervision, goes considerably beyond the routine issuance of subpoenas and other actions in which the United States Attorney has proceeded without specific direction of the grand jury. The order involves a major intrusion upon personal liberty which, if justified, is justified only upon the basis of the grand jury's unique investigative powers. Indeed, it has yet to be specifically established by the Supreme Court or a circuit court that a grand jury may compel an appearance in a lineup, although the language in *Dionisio* and *Mara* may be read as encompassing such authority.* In any event, the broadcast delegation of a power of this magnitude to the United States Attorney cannot be accepted if the grand jury's own role is to remain at all meaningful. *Cf. United States v. Dionisio, supra,* 410 U.S. at 23–24, 93 S.Ct. 764 (Douglas, J., dissenting). Assuming without deciding that a directive to appear in a lineup is within the grand jury's power to issue, we think that the directive has to come from the grand jury itself and has to be conveyed by the grand jury to the witness in an appropriately formal fashion. Thereafter, if the witness will not comply, the court upon petition of the United States Attorney may in supplemental proceedings assist the grand jury in securing compliance.

Because the district court's order was not shown to have been in aid of an appropriate directive of the grand jury issued to Melvin, and was lacking any other basis of authority, we hold that the order was beyond its authority to issue.

*The district court's order of July 28, 1976 is hereby vacated.*

---

* A majority of the judges of the Court of Appeals for the District of Columbia, over a lengthy dissent, has recently acquiesced in a grand jury's directive to a witness to attend a lineup. *In re Toon,* 364 A.2d 1177, (D.C.App. 1976).